**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN THOMPSON,<br><br>          Plaintiff,<br><br>v.<br><br>SAFEHOLD INC., JAY SUGARMAN, DEAN S. ADLER, JESSE HOM, ROBIN JOSEPHS, JAY S. NYDICK, and STEFAN M. SELIG,<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Thompson ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1. This is a stockholder action brought by Plaintiff against Safehold Inc. ("Safehold" or the "Company") and the members of Safehold's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. §240.14a-9 ("Rule 14a-9"), in connection with the Board's attempt to merge Safehold with its manager and largest shareholder, iStar Inc. ("iStar") (the "Proposed Transaction").

2. On August 10, 2022, Safehold entered into an Agreement and Plan of Merger with iStar (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, Safehold will

merge with and into iStar with iStar continuing as the surviving corporation ("New SAFE"). Safehold stockholders will have the right to receive one newly issued share of New SAFE common stock for each share of Safehold common stock they own. Prior to the merger, iStar will separate its remaining legacy non-ground lease assets and businesses and $400 million of its Safehold shares into a separate public company, Star Holdings ("SpinCo") (the "Spin-off"). According to the August 11, 2022 press release announcing the Proposed Transaction, upon completion of the Proposed Transaction, Safehold shareholders (other than iStar) are expected to own approximately 34% of New SAFE and iStar shareholders are expected to own approximately 37% of New SAFE directly and 14% indirectly as a result of the Spin-off. In conjunction with the Proposed Transaction, iStar has agreed to sell Safehold shares representing 9% of Safehold shares outstanding to MSD Partners, L.P. ("MSD") and, separately, to settle its long-term management incentive plan obligations using its Safehold shares representing 6% of Safehold shares outstanding.

3.      On January 31, 2023, the Board authorized the filing of the materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. Specifically, the Proxy Statement, which recommends that Safehold stockholders vote their shares in favor of the Proposed Transaction, contains materially incomplete and misleading information concerning, among other things: (i) the financial projections for Safehold and the combined company and the financial analyses that support the fairness opinion provided by the special committee of the Board's ("Special Committee") financial advisor J.P. Morgan Securities LLC ("J.P. Morgan"); and (ii) potential conflicts of interest faced by J.P. Morgan.

4. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Safehold stockholders need such information in order to make a fully informed decision in connection with the Proposed Transaction.

5. The special meeting for Safehold stockholders to vote on the Proposed Transaction is currently scheduled for March 9, 2023. It is imperative that such Exchange Act violations are promptly cured to enable Plaintiff and Safehold's other shareholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction. Therefore, Plaintiff seeks to enjoin the stockholder vote unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7. Personal jurisdiction exists over the defendants because each defendant either conducts business in or maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District. Safehold's common stock trades on the New York Stock Exchange, which is headquartered in this District, rendering venue in this District appropriate.

## THE PARTIES

9. Plaintiff is, and has been at all relevant times, the owner of shares of Safehold common stock.

10. Defendant Safehold is a Maryland corporation, with its principal executive offices located at 1114 Avenue of the Americas, 39th Floor, New York, New York 10036. Safehold's shares trade on the New York Stock Exchange under the ticker symbol "SAFE."

11. Defendant Jay Sugarman ("Sugarman") has been Chairman of the Board and Chief Executive Officer ("CEO") and a director of the Company at all relevant times. Defendant Sugarman has also served as Chairman of the board of directors of iStar since October 2016, as a director of iStar since 1996 and as CEO of iStar since 1997.

12. Defendant Dean S. Adler has been a director of the Company at all relevant times.

13. Defendant Jesse Hom has been a director of the Company at all relevant times.

14. Defendant Robin Josephs ("Josephs") has been a director of the Company at all relevant times. Defendant Josephs is also lead director of iStar's board of directors.

15. Defendant Jay S. Nydick ("Nydick") has been a director of the Company at all relevant times and is a member of the Special Committee. Defendant Nydick previously served as the president of iStar from November 2004 until September 2009.

16. Defendant Stefan M. Selig has been the Lead Director of the Company at all relevant times and is a member of the Special Committee.

17. Defendants identified in paragraphs 11-16 are collectively referred to herein as the "Board" or the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

4

18. Safehold operates its business through one reportable segment by acquiring, managing and capitalizing ground leases. Ground leases generally represent the ownership of land underlying commercial real estate projects that is net leased on a long-term basis by the fee owner of the land to the owners/operators of the real estate projects built thereon. Safehold is managed by SFTY Manager, LLC, a wholly-owned subsidiary of iStar. iStar is Safehold's largest shareholder, owning approximately 65% of the Company's common stock.

**The Proposed Transaction**

19. On August 11, 2022, Safehold announced that it had entered into the Proposed Transaction, stating, in relevant part:

> NEW YORK, Aug. 11, 2022 /PRNewswire/ -- Safehold Inc. (NYSE: SAFE) and iStar Inc. (NYSE: STAR) jointly announced today that the two companies have entered into a definitive agreement for a tax-free, strategic combination that will accelerate Safehold's market leadership in the ground lease industry and make Safehold the only internally-managed, pure-play ground lease company in the public markets.
>
> **Transaction Overview**
>
> - **Internalization of manager**: Under the terms of the transaction Safehold will internalize iStar's management team / intellectual property, replacing Safehold's external management structure. As part of the combination, Safehold will effectively assume iStar's $100 million in L+150 trust preferred securities due 2035 and Safehold will effectively issue 1.2 million new SAFE shares to iStar. The combined company ("New Safehold") will not be taking on other indebtedness or preferred equity from iStar.
>
> - **Ownership of New Safehold**: Ownership of New Safehold will remain largely proportionate to the ownership of Safehold immediately prior to consummating this transaction and New Safehold will continue to operate under the name Safehold Inc. Safehold shareholders (other than iStar) are expected to own approximately 34% of New Safehold. iStar shareholders are expected to own approximately 37% of New Safehold directly and 14% indirectly as a result of the spin-off transaction discussed below. In conjunction with the transaction, iStar has agreed to sell SAFE shares representing 9% of SAFE shares outstanding to MSD Partners, L.P. and, separately, to settle its long-term management incentive plan obligations

using its SAFE shares representing 6% of SAFE shares outstanding.

- **Spin-off transaction**: Prior to the merger, iStar will spin off to iStar shareholders a new publicly traded entity ("SpinCo") that will own all of its remaining non-ground lease assets and $400 million of its SAFE shares, enabling iStar shareholders to participate in the orderly monetization of these assets over time. SpinCo will be managed by New Safehold in exchange for a management fee.

**Strategic Benefits for Go-Forward Ground Lease Business**

The transaction will enhance Safehold's ability to grow the modern ground lease industry and unlock significant value creation for all stakeholders.

Specifically, Safehold will be strengthened by:

- **Better Structure**: Enables Safehold to internalize with the same management team who built the modern ground lease industry over the past five years. It also enhances governance, widely distributes voting power, and expands the number of independent directors on the Board.

- **Better Cost & Economics**: Reduces Safehold go-forward operating costs by an estimated $25 million annually by 2026 versus projected increasing management fees and reimbursable costs in an externally managed structure. It also enables Safehold to acquire iStar's interest in the Ground Lease Plus and Leasehold Loan funds and provides for transitional management fee revenue from SpinCo.

- **Better Debt & Equity Profile**: Expands SAFE's universe of potential equity investors, given its new internalized management structure and enhanced free float and liquidity profile. It further enhances credit ratings momentum by directly addressing key rating agency concerns related to governance.

"This transaction is an important step forward in our strategy to significantly expand the use of modern ground leases in commercial real estate and further extend Safehold's position as the pre-eminent ground lease company," said Jay Sugarman, Chairman and CEO of iStar and Safehold. "By unifying all parts of our ground lease business, we will create an even stronger company, providing building owners and developers with additional modern ground lease options to meet their capital needs, generating sizable cost savings over time, expanding our shareholder base to a much wider audience, and enabling shareholders of both Safehold and iStar to participate in the future growth of the modern ground lease sector they have created."

"Since IPO, we have grown Safehold almost twenty-fold in size and now have the opportunity to make the company even stronger and expand our reach with customers, investors and credit providers," said Stefan Selig, member of Safehold's Special Committee.

"iStar has been instrumental in supporting the growth of Safehold and the modern ground lease business since Safehold's IPO and we believe this strategic transaction is the best way for iStar shareholders to capture the growing value of the business as it scales in the future," stated Barry Ridings, member of iStar's Special Committee. "iStar shareholders will continue to be the beneficiaries of Safehold's future success."

**Strategic Investment**

Concurrent with the closing of the transaction, MSD Partners will make strategic investments in both Safehold and Caret, establishing it as one of the largest shareholders of Safehold and the largest third-party investor in Caret:

- iStar will sell 5.4 million shares of its SAFE holdings to MSD Partners for $200 million, representing a price of $37 per share, and will use the proceeds to repay debt.

- Safehold will sell 100,000 units of Caret to MSD Partners for $20 million, or $200 per unit, implying a total Caret valuation of $2 billion. The Caret units have no redemption options.

"We are delighted to support Safehold in executing this strategic transaction and are very pleased to become major shareholders of Safehold and Caret," said Coburn Packard, Partner at MSD Partners. "This investment is perfectly aligned with MSD's strategy of backing innovative, founder-led businesses in building long-term value. We have deep respect for what the Safehold management team has built and are excited about the potential to continue growing the platform and unlocking its full value."

"Adding MSD Partners, a large, sophisticated and well-respected investor, in both Safehold and Caret further demonstrates the attractiveness of Safehold's business and the unique value proposition of Safehold and Caret to Safehold shareholders," added Marcos Alvarado, President and CIO of iStar and Safehold.

**SpinCo**

iStar will contribute its remaining non-ground lease related legacy assets, the largest of which are Asbury Park and Magnolia Green, and approximately $400 million of its SAFE stock to SpinCo. By retaining certain assets and pursuing their orderly monetization, SpinCo will enable iStar shareholders to capture their potential upside value.

Additionally, SpinCo will be seeded with $50 million of cash and capitalized with a $100 million 8.0%, four-year term loan from New Safehold and up to $140 million of bank debt from Morgan Stanley Bank, N.A. which will be secured by $400 million shares of SAFE. iStar will distribute the equity interests in SpinCo to iStar shareholders on a one-for-one basis.

New Safehold will enter into a management agreement with SpinCo, under which it will continue to operate and pursue the orderly monetization of SpinCo's assets. SpinCo will pay to New Safehold an annual management fee of $25 million in year one, $15 million in year two, $10 million in year three and $5 million in year four. This agreement will provide New Safehold time to transition its overhead and infrastructure costs.

**Additional Information Related to the Transaction**

Prior to the closing of the transaction, iStar will undergo a reverse stock split to reduce the number of iStar shares outstanding to be equal to the number of SAFE shares owned by iStar immediately prior to the merger. At closing, the shares of SAFE owned by iStar will be retired and each share of SAFE not owned by iStar will be exchanged for one share of common stock of New Safehold.

In connection with the transaction, iStar intends to retire its senior unsecured notes and cash out its preferred equity in the combination transaction using cash on hand and proceeds from asset sales and loan repayments. iStar will settle iPIP, its long-term incentive plan, using a portion of its shares of SAFE. In addition, Safehold will acquire iStar's interest in the Ground Lease Plus and Leasehold Loan funds in cash for $79 million plus any future fundings prior to closing.

Based on recent stock prices, book values and estimates on the pace of asset monetizations, each share of STAR would receive a combined implied value of approximately $18.39, comprised of interests in SpinCo with a book value of $6.48 per share and an estimated 0.27 shares of SAFE, which had a closing price of $43.45 on August 10, 2022.

The transaction is expected to close in late Q4 2022 or in Q1 2023, subject to satisfaction of closing conditions, including the approval of both iStar and Safehold shareholders and completion of the spin-off.

The transaction was unanimously approved by the independent directors of iStar and Safehold based on the unanimous recommendations of special committees of the respective boards comprised solely of independent directors.

**Advisors**

>Lazard is serving as lead financial advisor and Clifford Chance US LLP is serving as legal advisor to iStar Inc. Morgan Stanley & Co. LLC is also serving as a financial advisor to iStar Inc.
>
>J.P. Morgan is serving as exclusive financial advisor and Kirkland & Ellis LLP is serving as legal advisor to the Safehold special committee.

**The Materially Incomplete and Misleading Proxy Statement**

20. On January 31, 2023, the Board caused to be filed a materially incomplete and misleading Proxy Statement with the SEC. The Proxy Statement, which recommends that Safehold stockholders vote their shares in favor of the Proposed Transaction, fails to disclose material information to Company stockholders, or provides them with materially misleading information, concerning: (i) the financial projections for Safehold and the combined company and the financial analyses that support the fairness opinion provided by the Special Committee's financial advisor J.P. Morgan; and (ii) potential conflicts of interest faced by J.P. Morgan.

*Material Misrepresentations and/or Omissions Concerning Safehold's and the Combined Company's Financial Projections and J.P. Morgan's Financial Analyses*

21. The Proxy Statement fails to disclose material information concerning the financial projections for Safehold and the combined company.

22. For example, the Proxy Statement sets forth that at a March 12, 2022 Special Committee meeting, J.P. Morgan reviewed with the Special Committee "draft projections provided by management that considered scenarios where management is internalized compared to continued external management, as well as scenarios contemplating additional sales of Caret units to third parties compared to no such sales." Proxy Statement at 53. At a July 5, 2022 Special Committee meeting, the Proxy Statement states that the Special Committee "asked questions of management regarding the financial models that management had provided, including the draft management projections for [Safehold]." *Id.* at 58. The Proxy Statement, however, fails to

disclose a summary of the financial projections the Special Committee reviewed at each of the March 12 and July 5, 2022 Special Committee meetings.

23. Additionally, in connection with rendering its fairness opinion, the Proxy Statement sets forth that J.P. Morgan reviewed, among other things, "the estimated amount and timing of the cost savings and related expenses and synergies expected to result from the SAFE transactions (the 'synergies')[.]" *Id.* at 83. Yet, the Proxy Statement fails to disclose a summary and quantification of the synergies relied upon by J.P. Morgan for its analyses.

24. The Proxy Statement also fails to disclose material information concerning J.P. Morgan's financial analyses.

25. With respect to J.P. Morgan's *Value Creation Analysis*, the Proxy Statement fails to disclose a quantification of: (i) the terminal values resulting from each of the "internalization of management" and "fees paid by SpinCo" analyses; and (ii) the inputs and assumptions underlying the discount rate range of 7.25% to 8.25%.

*Material Misrepresentations and/or Omissions Concerning J.P. Morgan's Potential Conflicts of Interest*

26. The Proxy Statement fails to disclose material information concerning J.P. Morgan's potential conflicts of interest.

27. For example, the Proxy Statement fails to disclose the details of any services J.P. Morgan or its affiliates have provided to MSD or its affiliates in the two years prior to the delivery of its fairness opinion, and any compensation J.P. Morgan or its affiliates have received for such services provided.

28. In sum, the omission of the above-referenced information renders statements in the "SAFE Unaudited Prospective Financial Information," "Background of the Merger," and "Opinion of the SAFE Special Committee's Financial Advisor, J.P. Morgan" sections of the Proxy Statement

materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the stockholder vote, Plaintiff and the other stockholders of Safehold will be unable to make a sufficiently informed decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Claims for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Safehold**

29. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

30. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9. Safehold is liable as the issuer of these statements.

31. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

32. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

33. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate

disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

34. The Proxy Statement is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

35. By reason of the foregoing, defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

36. Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II

### Claims for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

37. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

38. The Individual Defendants acted as controlling persons of Safehold within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Safehold and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

39. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

40. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

41. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

42. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Safehold, and against defendants, as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, including the stockholder vote on the Proposed Transaction, unless and until defendants disclose the material information identified above which has been omitted from the Proxy Statement;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to file a Proxy Statement that does not contain any untrue statements of material fact;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2023          **ACOCELLI LAW, PLLC**

By */s/ Richard A. Acocelli*
Richard A. Acocelli
33 Flying Point Road, Suite 131
Southampton, NY 11968
Tel: (631) 204-6187
Email: racocelli@acocellilaw.com

*Attorneys for Plaintiff*